**STATE of Missouri, Plaintiff–Respondent**

v.

**Tara Y. McCLANAHAN, Defendant–Appellant.**

No. 26935.

Missouri Court of Appeals,
Southern District,
Division One.

Oct. 2, 2006.

George W. Gilmore, Jr., Sikeston, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Daniel N. McPherson, Asst. Atty. Gen., for respondent.

JOHN E. PARRISH, Judge.

■ Tara Y. McClanahan (defendant) appeals convictions of arson in the first degree, § 569.040,[1] attempted murder in the second degree, §§ 565.021 and 564.011, and burglary in the first degree, § 569.160. This court affirms.

In reviewing defendant's conviction, this court considers the evidence in the light most favorable to the verdict ren-

1. References to statutes are to RSMo 2000.

dered by the jury. *State v. Ternetz*, 740 S.W.2d 713, 714 (Mo.App.1987).

All evidence and inferences that tend to support the verdict are accepted as true. *State v. Brown*, 660 S.W.2d 694, 698–99 (Mo.banc 1983). Evidence and inferences to the contrary are disregarded. Id. "The question is whether the evidence, viewed in a light most favorable to the State, is sufficient to support the verdict." Id. at 699, *citing State v. Story*, 646 S.W.2d 68, 72 (Mo.banc 1983).

*State v. Norris*, 813 S.W.2d 379, 380 (Mo.App.1991).

*State v. Morris*, 844 S.W.2d 549 (Mo.App. 1992). *See also State v. Xia*, 60 S.W.3d 28, 30 (Mo.App.2001).

Defendant's mother, Billie Davis, was in her home at Jackson, Missouri, the evening of June 17, 2004. She awoke to find a curtain in her bedroom on fire. She tried to throw water on the fire from a glass she had at her bedside, but was unable to extinguish the fire. She then attempted to put out the fire by hitting the flames with a pillow. Feathers from the pillow caught fire and stuck on Ms. Davis' arm and hip. Ms. Davis tripped and fell. Due to physical problems she experiences, she was unable to get up. She reached a walker and, with it, slid across the floor. As she entered the family room to the house, she saw a pair of shoes and was kicked in the head. She reached a phone but it would not work. She got into her kitchen, entered the garage from the kitchen, and opened the garage door with a remote control button.

Two people entered the garage from outside Ms. Davis' home and tried to assist her. Police officers also arrived. Ms. Davis was carried from the garage and taken to a hospital by ambulance. She was treated for burns and smoke inhalation. She remained hospitalized for a week and required breathing treatments for about two months. After her release from the hospital, Ms. Davis spent about four months at a life care center and another three months at Drury Lodge while her house was repaired.

In order to assist Ms. Davis, defendant was permitted to write checks from Ms. Davis' checkbook to buy groceries and pay Ms. Davis' bills. In June 2004, Ms. Davis' checking account was overdrawn; nearly 40 checks drawn on the account had been returned. Charges had been made to the account for the insufficient funds checks.

Defendant began dating Mark Messmer the end of May 2004. He and defendant began living together about a week after he met her. During the time they lived together, he and defendant passed checks that were drawn on Ms. Davis' account.

A bank employee talked to Ms. Davis about her account the week before June 17. Ms. Davis planned to come to the bank and go over the account with the employee. Ms. Davis had arranged a withdrawal from an IRA account she maintained at Edward Jones. She had a check for $3,000 she intended to deposit in her bank checking account. The check was in her home at the time of the fire.

Mark Messmer heard defendant talking on the telephone with Juanita Holderbaugh, a friend of defendant's, in the early morning hours of June 17, 2004. After the conversation ended, defendant told Mr. Messmer that Ms. Holderbaugh was coming to pick her up. Juanita Holderbaugh picked up defendant. Defendant returned sometime later. Mr. Messmer was asked the following questions and gave the following answers about what occurred.

Q. When the [d]efendant returned what did she say?

A. She come in and I was kind of coming down the hallway and she said, well, the old bitch should be dead now.

Q. Did you ask her to clarify?

A. I said what do you mean? She said, well, they went over to her mom's and parked up the road from there and went in the back door and through the basement and supposedly went into her mom's bedroom and set the bed and the bed sheets and stuff like that on that fire.

Juanita Holderbaugh was interviewed by police officers Butch Amann and Scott Eakers on July 9, 2004. She gave the following written statement:

On June 17, 2004 [defendant] and I got together about 1:30 a.m.[sic] She was dressed in black, and I was dressed in brown and black. I drove to her house. We took Miss Davis' car to Miss Davis' house. We walked to the sliding glass doors under the porch around the back of the house and we walked up the stairs. And [defendant] walked to the front room and placed a candle on the end table and then to the kitchen for a $3,000.00 check that Miss Davis received in the mail that day.

She set it by my shoes at the top of the stairs. Then we walked to the bathroom, down the hall from Miss Davis' room and [defendant] lit the candle. Then we crawled to Miss Davis' room and [defendant] was in the room. I was in the hall. I handed the candle to [defendant]. And she set the bed and curtains on fire. I backed off and hear Miss Davis up getting water. I then proceeded out the hall to the stairs with [defendant] behind me. [Defendant] said hurry, Juanita, hurry. We got out the door and went back to [defendant's].

I went home and called [defendant] telling her the garage door was open and there were flames. I went home

and took a shower and got in bed. About 2:30 to 3:30 we, me and Ron, got a phone call from Mark stating mom's, Miss Davis' house caught on fire and we needed to meet [defendant] over there.

So we went to the house and Miss Davis was taken to Saint Francis Hospital for treatment. I called my parents to take my daughter and we went to the hospital. The reason for setting the house on fire was to stop Miss Davis from going to the bank the next day. Miss Davis noticed some money missing out of her checking account. She wanted to get to the bottom of it. [Defendant] was afraid that Miss Davis would find out she was taking her money.

Later on the day of the fire, defendant took a check in the amount of $3,000 from Edward Jones, payable to Billie Davis, to the bank. She deposited $2,600 from the proceeds of the check and received $400 cash.

Defendant's first point on appeal argues that the trial court abused its discretion in overruling defendant's motion for new trial "in that the Trial Court erred in allowing Juanita Penfield to repeat statements allegedly made by Billie Davis including that Ms. Davis recognized [defendant's] shoes and [defendant's] giggling on the night of the fire because the alleged statements were hearsay and were highly prejudicial to [defendant] in that the only testimony placing [defendant] at the scene of the crime was this hearsay evidence and the unreliable testimony of Juanita Holderbaugh."

■ Point I asserts that "[i]t was an abuse of discretion for the Trial Court to overrule [defendant's] Motion for New Trial...." "It has long been the settled law that the denial of an after trial motion is not an appealable order but that appeal must be taken from the judgment to which

the motion was directed." *Pittman v. Reynolds,* 679 S.W.2d 892, 893 (Mo.App. 1984). *See also Roberts v. Roberts,* 800 S.W.2d 91, 93 (Mo.App.1990). Defendant's Point I continues, however, after asserting error in denying the motion for new trial, and argues error was committed by the trial court allowing Juanita Penfield to repeat statements allegedly made by Billie Davis. The allegation of error directed to the admission in evidence of that testimony will be addressed.

The testimony about which Point I complains was that of Juanita E. Penfield. Ms. Penfield is an employee of Edward Jones. She stated she was "an investment representative-stock broker for the company." Ms. Penfield had visited Ms. Davis "seven to ten days" after the fire. She visited her at a life care center where Ms. Davis was staying. Ms. Penfield was asked, "And did you have a discussion about some shoes that Billie Davis might have seen as she was crawling on the floor of her house while it was on fire?" Defendant's attorney objected that the question called for hearsay. The trial court overruled the objection.

Ms. Penfield answered, "While I was there in her room meeting her just as a friend to see if she was all right, to see how she was doing, she through her tears and crying said she couldn't understand how her daughter could do this. And I asked her innocently, . . . what made you think it was your daughter? She said as I was crawling down the hall I heard them laughing, giggling, and I also was kicked in the face and I recognized the shoes." Ms. Penfield was asked, "Did she recognize the giggle?" Ms. Penfield answered, "She said she recognized it to be her daughter, [defendant]."

■ As defendant asserts, the testimony of Ms. Penfield as to what she said she was told by Ms. Davis was hearsay. "A hearsay statement is any out-of-court statement that is used to prove the truth of the matter asserted and that depends on the veracity of the statement for its value." *State v. Sutherland,* 939 S.W.2d 373, 376 (Mo.banc), *cert denied,* 522 U.S. 871, 118 S.Ct. 186, 139 L.Ed.2d 125 (1997). Hearsay statements are generally inadmissible. Id.

> The underlying rationale for the hearsay rule is for the purpose of securing the trustworthiness of the assertions. *State v. Harris,* 620 S.W.2d 349, 355 (Mo.banc 1981). Courts generally exclude hearsay because the out-of-court statement is not subject to cross-examination, is not offered under oath, and the factfinder is not able to judge the declarant's demeanor and credibility as a witness. *Bynote v. National Super Markets, Inc.,* 891 S.W.2d 117, 120 (Mo.banc 1995). However, to the extent that a declarant "is available for live testimony under oath, the 'dangers of hearsay are largely non-existent.'" *State v. Schaal,* 806 S.W.2d 659, 664 (Mo.banc 1991), *cert. denied,* 502 U.S. 1075, 112 S.Ct. 976, 117 L.Ed.2d 140 (1992).

*State v. Link,* 25 S.W.3d 136, 145 (Mo. banc), *cert. denied,* 531 U.S. 1040, 121 S.Ct. 634, 148 L.Ed.2d 542 (2000).

■ Here, Ms. Davis was available to, and did, testify. She was asked about the conversation to which Ms. Penfield alluded and whether she made the statements to which Point I is directed. She denied saying that she recognized defendant's shoes and said the shoes she observed were men's shoes. She disputed the testimony that she had told Ms. Penfield defendant started the fire and that she told her she recognized laughing and giggling sounds as those of defendant. The jury had opportunity to assess the demeanor and testimony of both Ms. Penfield and Ms. Davis. To the extent that the admis-

sion of Ms. Penfield's testimony concerning her conversation with Ms. Davis was hearsay, its admission was not prejudicial to defendant. "Prejudice will not be found from the admission of hearsay testimony where the declarant was also a witness at trial, testified on the same matter, and was subject to cross-examination." *State v. Hamilton*, 892 S.W.2d 371, 378 (Mo.App. 1995). Point I is denied.

■ Point II asserts that the trial court erred in allowing a tape-recorded statement of Juanita Holderbaugh to be played in its entirety at trial "because the tape recorded [sic] statement was hearsay and no foundation was laid for portions of the tape recording to be admitted pursuant to Sec. 491.074 RSMo., including statements that [defendant] and Ms. Holderbaugh had in the past conspired to murder Billie Davis." Section 491.074 states, "Notwithstanding any other provisions of law to the contrary, a prior inconsistent statement of any witness testifying in the trial of a criminal offense shall be received as substantive evidence, and the party offering the prior inconsistent statement may argue the truth of such statement."

Defendant did not deposit any trial exhibits with this court. The transcript identifies one exhibit, State's Exhibit No. 4, as "Taped Interview." Jackson, Missouri, police officer, Lt. Rodney Barnes, identified State's Exhibit No. 4 as the recording of the conversation he had with Juanita Holderbaugh.

Defendant filed a motion in limine that was heard prior to the commencement of trial. It included a request that "the state's prosecuting officials or any of its witnesses" be precluded "from stating, commenting, testifying or introducing into evidence by way of an exhibit anything relating to ... [s]tate witness Juanita Holderbaugh's audio recorded statements regarding her criminal acts towards Billy

[sic] Davis offered for the truth of the matter asserted therein." The motion asserted that "[s]aid statements constitute impermissible hearsay."

The trial court overruled the part of the motion in limine directed to Ms. Holderbaugh's recorded statement. The judge advised the attorneys, "We'll allow the testimony and the playing of the tape of Juanita Holderbaugh upon the proper foundation being laid. That is the ruling of the Motion in Limine, part three."

Juanita Holderbaugh testified at trial. She acknowledged giving the statement; that it was tape-recorded. On cross-examination she stated that, contrary to the statement, she had not participated in setting the fire. She discussed things said that were included in the statement and was then asked if she was saying that the confession was false. She answered, "It is."

The state adduced testimony from other witnesses regarding the taking of Ms. Holderbaugh's statement and then offered the tape recording, State's Exhibit No. 4, in evidence. The trial judge inquired whether defense counsel had "further objections other than the one previously made." Defense counsel answered, "No." State's Exhibit No. 4 was admitted in evidence, after which it was played for the jury.

Defendant argues that State's Exhibit No. 4 included statements that the state did not ask Ms. Holderbaugh at trial; that, therefore, Ms. Holderbaugh "was never given the opportunity to become 'inconsistent.'" Defendant, relying on *State v. Cole*, 867 S.W.2d 685 (Mo.App.1993), contends no proper foundation was established that permitted playing of the entire tape recording.

In *Cole*, during cross examination, defense counsel pointed out four inconsisten-

cies in the testimony of a witness for the state and a tape-recorded statement that the witness had previously given. Defense counsel played the four parts of the recorded statement that contained the inconsistencies. The witness then recanted those parts in her trial testimony.

On redirect, the state was permitted, over Ms. Cole's objection, to play the entire tape recording of the witness' pretrial statement. The defendant in *Cole* argued on appeal that playing the entire tape recording was improper bolstering and constituted prejudicial error. The Eastern District of the court agreed. It explained:

> A prior consistent statement may be used to rehabilitate a witness who has been impeached by a prior inconsistent statement. *State v. Clark*, 711 S.W.2d 928, 933 (Mo.App.1986). The use of the prior consistent statement should be limited, however, to the extent necessary to counter the subject on which the witness was impeached. Id. The use of a prior consistent statement which exceeds the scope of the impeachment is incompetent and inadmissible. *See Id.*

867 S.W.2d at 686. The Eastern District declared that it was unable to declare the admission of the entire tape-recorded statement harmless beyond a reasonable doubt.

As the state points out, the objection to the tape recording here in question being admitted in evidence was that it was hearsay; whereas, in Point II defendant argues the state failed to make a sufficient foundation to permit admission of the tape recording. The state argues that this is a different theory than was posed in the trial court; that, therefore, it was not preserved for appellate review.

■ The state, arguably, is correct. "A reviewing court will not consider objections to evidence raised for the first time on appeal and will not convict the trial court of an error it was given no opportunity to correct." *Brown v. Jones Store*, 493 S.W.2d 39, 41 (Mo.App.1973). "Nothing is preserved for appellate review when the assignments of error in a motion for new trial and on appeal are enlargements of a general objection made at the time of trial." [2] *State v. Cummings*, 134 S.W.3d 94, 108 n. 7 (Mo.App.2004).

Regardless, Juanita Holderbaugh testified at trial. She testified that she gave statements to the police regarding the circumstances surrounding the events that produced the criminal charges for which defendant was on trial. She testified to the issues to which the tape-recorded statement was directed. She acknowledged that she had confessed to participating in the setting of the fire. On cross-examination, Ms. Holderbaugh testified that she confessed to police that she participated in the fire. She said she gave her confession July 9 "and also verbally told officers things." She was asked, "You're saying today that confession is false?" She answered, "It is." She admitted making statements to police and denied the truthfulness of those statements.

■ In *State v. Patterson*, 826 S.W.2d 38 (Mo.App.1992), the defendant argued, as does defendant in this case, that the state had not asked specific questions to establish contradictions relied on in introducing prior statements as inconsistent. *Patterson* held:

> Such traditional foundation questions are not necessary. As the Supreme Court of Missouri concluded in *State v.*

**2.** The motion for new trial in this case included a challenge to the foundation for admitting the tape recording in evidence notwithstanding that the motion in limine and trial objections posed only hearsay objections to the use of the tape recording.

*Bowman,* 741 S.W.2d 10, 14 (Mo.banc 1987), *cert. denied,* 488 U.S. 829, 109 S.Ct. 83, 102 L.Ed.2d 60 (1988) (footnotes omitted), "The only necessary foundation is the inquiry as to whether the witness made the statement, and whether the statement is true. Any requirement of additional foundation would dilute the effect of [§ 491.074]." Id. at 40. That holding is apropos here. Point II is denied.

Point III asserts that the trial court erred in overruling defendant's motion for new trial "in that the Trial Court allowed Juanita Penfield to testify about other 'bad acts' allegedly committed by [defendant] because such evidence of prior bad acts was inadmissible since it was not relevant to prove any element of the crimes charged and this testimony was highly prejudicial to [defendant]."

Here, as with respect to Point I, the allegation of error directed to the admission of evidence at trial will be addressed rather than the complaint that defendant's motion for new trial was denied. *See Pittman v. Reynolds, supra.* Although not discernable from the point relied on, Point III is directed to testimony of Ms. Penfield that defendant had cursed her about failures of Edward Jones to withhold taxes from Ms. Davis' security transactions; that defendant had called Ms. Davis a "f____ bitch"; that defendant had been upset at Ms. Penfield because Ms. Penfield would not give defendant information relating to Billie Davis' account with Edward Jones.

Evidence of uncharged crimes, wrongs, or acts is inadmissible for the purpose of showing the propensity of the defendant to commit the charged crime. Such evidence is admissible, however, if it is both logically and legally relevant. To be logically relevant, the evidence of prior misconduct must have a legitimate tendency to establish directly the defendant's guilt of the charged crime. *State v. McCracken,* 948 S.W.2d 710, 713 (Mo.App.1997).

As in *McCracken,* the evidence about which defendant complains exhibits a continuing animus of defendant toward the victim, her mother. The evidence substantiates motive. It demonstrates defendant's attempts to garner access to her mother's assets and information about those assets.

The evidence was that defendant had misused Ms. Davis' funds; that she was attempting to hide these facts by burning Ms. Davis' house while Ms. Davis slept in that house. Ms. Penfield's testimony was logically and legally relevant to the charges for which defendant was tried. Point III is denied. The judgment is affirmed.

RAHMEYER, P.J., and LYNCH, J., concur.