STATE of Missouri, Plaintiff–
Respondent,

v.

Donald OVERTON, Defendant–
Appellant.

No. 28282.

Missouri Court of Appeals,
Southern District,
Division One.

June 30, 2008.

Petition for Rehearing and Transfer to
Supreme Court Denied Aug. 13, 2008.

Application for Transfer Denied
Sept. 30, 2008.

S. Kathleen Webber, Kansas City, MO, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Karen L. Kramer, Asst. Atty. Gen., Jefferson City, MO, for respondent.

JEFFREY W. BATES, Judge.

Donald Overton (Defendant) was found guilty by a jury of committing murder in the first degree. *See* § 565.020.[1] On appeal, Defendant presents four points for decision. He contends that the trial court: (1) erred in denying Defendant's first motion to dismiss based on an alleged violation of the Interstate Agreement on Detainers (IAD) because his trial did not occur within 180 days after the prosecutor and court received his request for final disposition of detainer; (2) erred in denying Defendant's second motion to dismiss based on the same ground as applied to subsequent continuances after the first trial resulted in a mistrial; (3) abused its discretion in failing to grant a mistrial for certain comments the prosecutor made during closing argument; and (4) abused its discretion in failing to grant Defendant's motion for a mistrial after the prosecutor elicited testimony about another murder during the direct examination of a witness for the State. This Court affirms.

## I. Factual and Procedural Background

An appellate court considers the facts and all reasonable inferences derived therefrom in a light most favorable to the verdict and disregards all contrary evidence and inferences. *State v. Chaney*, 967 S.W.2d 47, 52 (Mo. banc 1998). Viewed from that perspective, the favorable evidence and inferences supporting the State's case against Defendant are summarized below.

All of the events relevant to this appeal took place in Joplin, Missouri. Israel Ward (Ward) was a member of the Red "Money Over Bitches" (MOB) Gangsters.[2] Ward had been friends since 1991 with Brian McDaniel (McDaniel), who was another MOB gang member. Defendant was not a member of MOB; he belonged to the Bloods gang. Ward also knew Kendace "Sissy" DeCarlo (Victim). She was not a gang member, but she knew a lot of persons who were.

Victim and another gang member named "Mad Dog" were involved in a relationship. Later, Mad Dog introduced Victim to McDaniel. He and Victim became romantically involved. Nevertheless, McDaniel had a problem with a prior relationship between Victim and Mad Dog. In the presence of Ward and Defendant, McDaniel said: (1) he wanted Victim and Mad Dog killed; (2) McDaniel could not kill Victim himself because he could be easily identified, he had lived with Victim and her children at one time, and everyone knew he had a "beef" with her; (3) no one in Joplin knew Defendant, so he would be the one to kill Victim and Mad Dog. McDaniel also showed a .380 handgun to Ward and Defendant.

On July 3, 2001, Michael Wheeler (Wheeler) was at the home of Valerie Moss (Moss) and her son, Brad. The Mosses resided at 3530 S. Pearl Avenue in Joplin. The trio had taken Wheeler's car to get

---

1. All references to statutes are to RSMo (2000).

2. This gang operated primarily out of Tulsa, Oklahoma.

some sandwiches and were returning home between 9:30 and 10:00 p.m. As they approached the Mosses' residence, they saw an unfamiliar car parked across the street from the house. The vehicle was a small white four-door sedan. The driver was an African–American man wearing glasses. As Wheeler's vehicle drew nearer, its headlights fell upon the sedan. The driver leaned over and back in the seat in order to hide. After Wheeler pulled into the driveway, he walked over to the rear of the sedan to see if he recognized the driver. Wheeler heard someone running down a gravel alley that ran perpendicular to the street. This alley connected S. Pearl Avenue to S. Joplin Avenue, which was two blocks away. Wheeler and the Mosses all saw the second man in the alley. He was about 50 feet away, running toward S. Pearl Avenue. The area was well lit by floodlight illumination. This second man was an African American. He was at least 6 feet tall and was running "at a good pace." This man, who appeared startled to see Wheeler and the Mosses, stopped in the yard for a second and said, "What's up, dog?" He was not wearing glasses. He got into the sedan, and the two men took off quickly without turning on the vehicle's headlights.

A murder was reported by telephone at 9:44 p.m. Officer Gabriel Allen (Officer Allen) heard a radio dispatch that a woman had been found in a pool of blood at 3532 S. Joplin Avenue. This location was two blocks from the Mosses' residence and was accessible through the alley that connects S. Pearl and S. Joplin Avenues. Officer Allen arrived at the scene about 35 minutes later. Victim was found lying face down in a pool of blood in the front entryway of her house, two to three feet from the front door. Several teeth fragments were spread across the floor. Two spent .380 shell casings and three live RP .380 rounds were found on the front porch of Victim's house. A black cordless phone

from Victim's house was found on the front walkway leading to the house.

On the day of the murder, Ward was in Seattle, Washington on vacation. He called McDaniel's grandmother, who told him that Victim had been murdered. After Ward returned from his trip, he met with McDaniel and Defendant to find out what had happened. McDaniel said that he had "handled" Victim, but he still wanted to get Mad Dog. Defendant said that he shot Victim until she was dead and then disposed of the murder weapon.

Wheeler, Valerie Moss, and Brad Moss each identified McDaniel as the driver of the sedan that sped away from S. Pearl Avenue on the night of the murder. These same witnesses each identified Defendant as the man they saw running down the alley between S. Pearl and S. Joplin Avenues.

During an interview by police, Defendant gave the following account of how Victim was killed: McDaniel was upset with Victim because she had flirted with another guy. Defendant took his girlfriend's car and drove McDaniel from Tulsa to Joplin so McDaniel could talk with Victim. They parked down the alley near Victim's house. McDaniel had a .380 handgun in his pocket. He walked down the alley to Victim's house and was gone five to ten minutes. McDaniel was sprinting back to the car when he saw some people. He slowed his pace to a jog and got back in the car. Once inside, he said Victim wouldn't listen to him, so he shot her. The gun was in McDaniel's lap. He told Defendant to say that he did not know anything about the murder.

The police concluded that Defendant had reversed the roles between himself and McDaniel, given that witnesses had placed McDaniel in the driver's seat of the car and identified Defendant as the man coming down the alley. Wheeler and the

Mosses also recognized the white sedan that Defendant had admittedly driven from Tulsa to Joplin. Some live RP$_f$ .380 rounds were found during a later search of McDaniel's car, which was a different vehicle than the one observed by witnesses at the scene.

An autopsy revealed that Victim had sustained one gunshot wound to the upper lip and a second gunshot wound to the occipital region at the back of her head. This second shot was fatal. The bullet from the first shot was lodged in soft tissue in the lateral portion of the neck. The bullet from the second shot passed from the occipital region through the mid-portion of the brain to the maxillary sinuses. Both bullets were recovered and turned over to police. Ballistic analysis revealed that Victim had been shot with a .380 caliber gun.

A jury found Defendant guilty of murder in the first degree. He had waived jury sentencing, and the trial court imposed a sentence of life imprisonment without the possibility of parole. This appeal followed.

## II. Discussion and Decision

### Points I and II

Because of the related nature of Defendant's first two points, we will address them together. Defendant contends that the trial court erred in denying his first motion to dismiss (Point I) and second motion to dismiss (Point II) because he was not tried within the 180–day statutory period set forth in Article III, Paragraph 1

of the IAD. *See* § 217.490. An appellate court conducts a *de novo* review of the trial court's application of the law in refusing to dismiss an indictment against a defendant pursuant to the IAD. *State v. Lybarger,* 165 S.W.3d 180, 184 (Mo.App. 2005). On the other hand, "[t]o the extent the application of law is based on the evidence presented, we view the facts in a light most favorable to the judgment, giving deference to the trial court's factual findings and credibility determinations." *Id.; State v. Davis,* 210 S.W.3d 229, 233 (Mo.App.2006).

The following additional facts are relevant to the disposition of Defendant's first two points. In December 2004, Defendant was an inmate in the Texas Department of Criminal Justice. As required by the IAD, Defendant sent a written request for disposition of the first-degree murder charge pending against him in Missouri to the Circuit Court of Newton County, Missouri, and to the Newton County Prosecuting Attorney. Defendant's request for disposition was received by the court and the prosecutor on December 20, 2004. The parties agree that June 20, 2005, was the last day to bring Defendant to trial within the time period allowed by the IAD.[3]

On May 26, 2005, a hearing was held in open court at which Defendant's case was set for a jury trial commencing on August 22, 2005. This hearing, which occurred approximately one month before the IAD time limit expired, was not recorded.[4] On July 22, 2005, Defendant filed his first motion to dismiss the charge against him

---

3. The day of the request's receipt is excluded from the 180–day period. *See State v. Nichols,* 207 S.W.3d 215, 221 (Mo.App.2006). Measured from December 21, 2004, the last day of the 180–day period is June 18, 2005. Because that day was a Saturday, however, the statutory period was extended through Monday, June 20, 2005. *See* Rule 20.01(a) Missouri Court Rules (2004).

4. The only evidence of the hearing in the record is a docket entry stating: "26–May–2005 Hearing Held JURY TRIAL SET 8/22/2005 AT 8:30 A.M. SET FOR 3 DAY TRIAL. PTC SET 7/28/2005 AT 1:30 P.M. KS[.]"

because he was not tried within the required 180 days.

On July 28, 2005, the court held a hearing on the motion to dismiss. At that hearing, defense counsel argued that the 180–day period under the IAD had expired on June 20, 2005. Defense counsel stated that he did not object to the August 22, 2005 trial setting; instead, he remained silent on the issue. Counsel argued that he had no obligation to notify the court or the prosecutor of Defendant's rights under the IAD and that mere silence did not constitute a waiver. Defense counsel also acknowledged that he did not request a record of the hearing at which the trial date was set.[5]

On August 19, 2005, the trial court overruled Defendant's motion to dismiss. The court made the following factual findings: (1) Defendant appeared in open court with his attorney on May 26, 2005; (2) the hearing was not recorded because defense counsel affirmatively stated that no record was necessary; (3) the trial court offered a setting in early June 2005, but defense counsel stated that he could not try the case until August 2005 due to other assigned cases; (4) Defendant's case was set beyond the IAD time limit because of conflicts with defense counsel's schedule; (5) Defendant was present for the discussions, and the court observed defense counsel inform Defendant of the decisions that had been made as to scheduling the trial without any objection being made by Defendant; and (6) after reviewing the attorney's calendars and their memos to the court, it was apparent that defense counsel's recollection of events was incorrect. The court ultimately concluded as follows:

The Defendant requested the case be set beyond the 180th day because his counsel was unable to adequately prepare for trial and be available to try his case with the 180 day time limit. The Defendant was present and did not object to the setting based upon his attorney's need for additional time. Therefore, Defendant has waived his right to be tried within 180 days. Defendant's motion to dismiss is denied.

On August 22, 2005, Defendant's trial commenced as scheduled. Due to pre-trial publicity and certain comments made by potential jurors, the court declared a mistrial. The trial was rescheduled for October 25, 2005. Thereafter, the case was continued. The trial eventually took place on December 12, 2006.

▮▮▮ "The IAD is a congressionally-sanctioned interstate agreement that permits a prisoner in one state to seek disposition of criminal charges filed against him by [a] second state." *State v. Lybarger*, 165 S.W.3d 180, 184 (Mo.App.2005); *see* §§ 217.490–.520. "The purpose of the IAD, as set forth in Article I, is to encourage the expeditious and orderly disposition of charges outstanding against a prisoner and determination of the proper status of any and all detainers based on untried indictments, informations, or complaints." *State v. Vinson*, 182 S.W.3d 709, 711 (Mo.App. 2006). Article III, Paragraph 1 of § 217.490 provides that once a detainer is lodged, the prisoner may file a request for disposition of the untried charges. That same paragraph requires that, after the request has been properly served in the receiving state, the prisoner must be

---

5. During this colloquy, the judge recalled that defense counsel had requested an August 2005 trial setting due to scheduling conflicts in June and July. Defense counsel said it was the prosecuting attorney who requested the August setting. The court asked the attorneys to submit their calendars and independent recollections of the hearing, and took the motion under advisement until this information was received. The court noted that, "by agreement of the parties, the Court may consider and review any and all documents submitted as a part of this record to make that determination on the motion."

brought to trial within 180 days or the charges must be dismissed. *Id.* The IAD is to be construed in harmony with our intrastate Uniform Mandatory Disposition of Detainers Law (UMDDL), which is codified in §§ 217.450–.485. *State v. Smith,* 686 S.W.2d 543, 547 (Mo.App.1985); *see State ex rel. Garrett v. Dally,* 188 S.W.3d 111, 117 n. 6 (Mo.App.2006).

 "The 180–day limitation is not absolute." *Smith,* 686 S.W.2d at 547. Article III, Paragraph 1 of § 217.490 provides that "for good cause shown in open court, the prisoner or his counsel being present, the court having jurisdiction of the matter may grant any necessary or reasonable continuance." *Id.* Article VI, Paragraph 1 of § 217.490 further provides that "the running of the time periods shall be tolled whenever and for as long as the prisoner is unable to stand trial, as determined by the court having jurisdiction of the matter." *Id.* Extension of the time period has been granted due to a prisoner's express or implied waiver of the time period. *Smith,* 686 S.W.2d at 547. Any delay of a prisoner's trial which results from his affirmative action or agreement is not to be included in the period of limitation. *Id.* Thus, the time period has been tolled when: (1) a defendant asked for additional time to prepare; (2) the trial court granted a defendant's oral request for a continuance that was not made in open court; (3) a defendant expressly consented to a continuance beyond the limitation period; (4) a trial was delayed by plea bargaining actively pursued by defendant; (5) a delay results from a continuance requested by defendant; (6) a delay is necessary because of motions filed by the defendant; and (7) a defendant asked for a trial setting beyond the period of limitations. *Id.* at 547–48; *see Russell v. State,* 624 S.W.2d 176, 179–80 (Mo.App.1981).

 "When the time limitation under the agreement has expired, the burden is upon the state to produce evidence there was good cause within the meaning of the agreement to delay the trial beyond 180 days." *State v. Smith,* 686 S.W.2d 543, 547 (Mo.App.1985); *State ex. rel. Hammett v. McKenzie,* 596 S.W.2d 53, 59 (Mo.App. 1980). In Defendant's first point, he contends that the State did not meet its burden of showing a necessary or reasonable continuance was granted in open court, with Defendant or his counsel present, and therefore, the indictment against him should have been dismissed. Relying exclusively on *Smith, supra,* Defendant argues on appeal, as he did below, that he had no obligation to notify the court or the prosecutor of his rights under the IAD and that his mere silence at the trial-setting hearing did not constitute a waiver. This Court disagrees.

*Smith* is easily distinguishable from the case at bar. In *Smith,* due to a rotating-docket procedure, the defendant's trial date was continued several times without him being present in court. *Id.* at 545. The defendant did not appear in court for a trial setting until *after* the 180 days had expired. *Id.* at 546. This Court, therefore, determined that "[t]here was no good cause for continuance shown in open court." *Id.* at 549. We further held that " '[a] waiver is not ordinarily found from mere silence. The Agreement puts no affirmative obligation on the prisoner to alert the court of his IAD rights. We think it inappropriate to impose such an obligation.' " *Id.* (quoting *Brown v. Wolff,* 706 F.2d 902, 907 (9th Cir.1983)). To clarify, the defendant in *Smith* had no affirmative obligation to alert the state of his need to appear in court and set a trial date within the 180–day limitation.

In *Smith,* the state had argued that the defendant should have objected to the trial setting beyond the 180–day limitation, based on *Pethtel v. State,* 427 N.E.2d 891

(Ind.App.1981). This Court did not reach that argument for the following reason:

> The state relies upon *Pethtel v. State*, 427 N.E.2d 891 (Ind.App.1981). In that case, four weeks before the expiration of the period of limitation, with defendant and counsel present, the court set the case for trial after the expiration of that period. The court followed the rule applicable to the speedy trial act of that state. That rule was declared to be "a defendant is not entitled to discharge where he has notice a trial will be set beyond the time period permitted by the Rule and yet does not object 'at a time when the court could ... grant him a trial date within the proper period.'" *Pethtel v. State, supra*, at 894.... It is not necessary for this court to accept or reject the doctrine of *Pethtel*. The docket call that resulted in the trial setting of April 11, 1983, was not held until well after the 180–day period of limitation had expired.

*Smith*, 686 S.W.2d at 549.

Here, as in *Pethtel*, the Defendant was in open court for his trial setting at a hearing nearly four weeks *before* the expiration of the period of limitation. In contrast to *Smith*, this Court now has facts before it that require consideration of the acquiescence doctrine adopted in *Pethtel*. There, the Indiana appellate court held that a defendant under the IAD was required to object to a trial setting beyond the 180 days when the court could grant him a trial date within the proper period. *Pethtel*, 427 N.E.2d at 894. The court explained:

> The logic of such holding is that while a defendant may not be required to take affirmative action to bring himself to trial, other than to request an early trial if desired, if he sits idly by at a time when the court could yet grant to him a trial date within the proper period and permits the court, without objection, to

set a date beyond the expiration of such period, he will be deemed to have acquiesced therein. "... The courts are under legal and moral mandate to protect the constitutional rights of accused persons, but this should not entirely relieve them from acting reasonably in their own behalf. We will vigorously enforce the right to a speedy trial, but we do not intend that accused persons should escape trial by abuse of the means that we have designed for their protection."

*Id.* (citations omitted). The reasoning in *Pethtel* is sound, and we adopt it. The hearing to set Defendant's case for trial was held almost one month before the IAD time limit expired. The trial court could have set the case in early June if such a setting had been requested. Because Defendant did not object to the August 2005 trial setting, he acquiesced to a trial date beyond the 180–day IAD time limit. *Id.*

Our holding in this case is in accord with decisions from several other jurisdictions that have addressed this same issue under the IAD. *See, e.g., Saffold v. State*, 521 So.2d 1368, 1372 (Ala.Crim.App.1987); *Phillips v. State*, 15 Ark.App. 372, 695 S.W.2d 388, 390 (Ark.Ct.App.1985); *People v. Newton*, 764 P.2d 1182, 1188 (Colo. banc 1988); *Moon v. State*, 258 Ga. 748, 375 S.E.2d 442, 447 (1988); *State v. Schmidt*, 84 Hawai'i 191, 932 P.2d 328, 336–37 (Ct. App.1997); *Scrivener v. State*, 441 N.E.2d 954, 956 (Ind.1982); *State v. Garmon*, 972 S.W.2d 706, 711 (Tenn.Crim.App.1998); *Jones v. State*, 813 P.2d 629, 646 (Wyo. 1991). Our holding also is in accord with prior Missouri appellate opinions addressing the same issue under § 217.460 of the UMDDL. *See, e.g., State v. Nichols*, 207 S.W.3d 215, 222 n. 6 (Mo.App.2006) (where the record indicates that the defendant failed to object to a continuance, he acquiesced to a trial date beyond the 180–day period); *State v. Jackson*, 155 S.W.3d

849, 853 (Mo.App.2005) (defendant waived compliance with the 180–day limit because he did not object to a trial date beyond that time period, which tolled the statute); *Lee v. State,* 97 S.W.3d 9, 14–15 (Mo.App. 2002) (same holding). Like those defendants under the UMDDL, because Defendant herein failed to object and therefore acquiesced to a trial date beyond the limitation period, he waived his right under the IAD to be tried within 180 days. *See Jackson,* 155 S.W.3d at 853; *Lee,* 97 S.W.3d at 15. Because this acquiescence and waiver occurred in open court at the May 26, 2005 hearing to set the case for trial, the State met its burden of showing good cause as required by Article III, Paragraph 1 of § 217.490. *See Nichols,* 207 S.W.3d at 222–23. The trial court did not err in denying Defendant's first motion to dismiss. Point I is denied.

In Defendant's second point, he contends the trial court erred in denying his second motion to dismiss for violating the IAD. Defendant filed a second motion to dismiss on November 22, 2006. This motion followed several continuances that were granted after the August 22, 2005, trial resulted in a mistrial. Defendant argues that, due to the mistrial, he had not yet been brought to trial within 180 days. Therefore, that time limit continued to apply to the subsequent continuances, some of which he opposed. Because this additional time period exceeded 180 days, Defendant argues that dismissal was required. We find no merit in this argument.

As we ruled in disposing of Point I, Defendant waived his right to be tried within 180 days by acquiescing to the August 2005 trial date at the hearing in May 2005. *See Jackson,* 155 S.W.3d at 853; *Lee,* 97 S.W.3d at 15. In any event, the 180–day limitation was satisfied when Defendant's trial commenced on August 22, 2005. The fact that the court declared a

mistrial has no bearing on whether the trial was timely commenced as required by the IAD. "The [IAD] and the UMDDL are in *pari materia,* both provide for a defendant to be brought to trial within a prescribed 180–day limit, they are construed in harmony with each other, and the principles of one may be applied to the other." *Carson v. State,* 997 S.W.2d 92, 96 (Mo. App.1999). Cases applying the UMDDL have held that a defendant's trial was timely commenced so as to comply with the statute, even though a mistrial was declared. *See State v. Clark,* 809 S.W.2d 139, 141–42 (Mo.App.1991); *State v. White,* 728 S.W.2d 564, 567 (Mo.App.1987). We reach the same result here. Point II is denied.

### *Point III*

In Defendant's third point, he contends the trial court abused it's discretion in failing to grant his request for a mistrial after certain statements were made by the prosecutor in closing argument. This claim of error arises from the following events. In rebuttal closing argument, the prosecutor argued, in pertinent part, as follows:

> It's up to the twelve of you. The family of Sissy DeCarlo I am sure to a person would wish that their Sissy had never met a gang member. If she hadn't she would knowingly not [sic] still be alive. Her children would still have a mother, and her mother and father would still have a daughter. And you know this is her. But the reality is she made a mistake, as many, many twenty-somethings will do, and she fell in love with a bad man, and for this decision her punishment was death.

At this point, defense counsel objected. He asserted that the argument was not a reasonable inference from the evidence and that the prosecutor was trying to un-

duly elicit sympathy from the jury. The trial court overruled the objection. Defense counsel requested a mistrial and, in the alternative, requested that the prosecutor be ordered to refrain from any further argument along those lines. Both requests were denied.[6]

■ On appeal, Defendant contends the trial court should have granted a mistrial.[7] "Declaring a mistrial is a drastic remedy that should only be employed in those extraordinary circumstances in which the prejudice to a defendant can be removed in no other way." *State v. Dorsey*, 156 S.W.3d 791, 803 (Mo.App.2005). The decision whether to declare a mistrial rests largely within the trial court's discretion because the judge has observed the incident that precipitated the request for a mistrial and is in a better position than an appellate court to determine what prejudicial effect, if any, the incident had on the jury. *Id.; see State v. Smith*, 32 S.W.3d 532, 552 (Mo. banc 2000). A trial court abuses its discretion when its ruling is clearly against the logic of the circumstances before it and when the ruling is so arbitrary as to shock this Court's sense of justice and indicate a lack of careful consideration. *State v. Wheeler*, 219 S.W.3d 811, 815 (Mo.App.2007). An appellate court will reverse a conviction "only if the challenged comments had a decisive effect on the jury verdict, meaning that there is a reasonable probability that, in the absence of the comments, the verdict would have

been different." *Smith*, 32 S.W.3d at 552. The burden is on the defendant to demonstrate the decisive effect of the comments. *State v. Miller*, 226 S.W.3d 262, 266 (Mo. App.2007); *State v. Vanlue*, 216 S.W.3d 729, 734 (Mo.App.2007).

Defendant contends the trial court abused its discretion in failing to grant a mistrial because the prosecutor's comments "were designed solely to inflame the passions and prejudices of the jury." Defendant specifically argues that the "suggestion of gang membership ... is so inflammatory that there is at least a likelihood that the jury based its verdict not on the admissible evidence, but on this appeal to their fears that street gangs would infest their community unless they locked up [Defendant]." The State counters by first pointing out that the prosecutor made no such argument at trial and further argues that Defendant failed to meet his burden to demonstrate a decisive effect of the prosecutor's statements. We agree.

■ As an initial matter, we note that the prosecutor's reference to gang membership during closing was not new. Instead, it was cumulative of a host of evidence concerning gang membership that had pervaded the entire trial. Such evidence was relevant and had substantial probative value to explain, for example, Defendant's relationships to other gang members and to the Victim, as well as to explain the motive for the killing. *See*

---

6. On appeal, Defendant also argues that the prosecutor's comments were improper personalization and outside the scope of the evidence. These objections, however, were not made at trial. An appellant cannot broaden or change allegations of error on appeal. *State v. Cartwright*, 17 S.W.3d 149, 154 (Mo. App.2000). The point raised on appeal must be based upon the same objection that was made at trial and preserved in the motion for new trial. *State v. McClanahan*, 202 S.W.3d 64, 70 (Mo.App.2006). We will not convict a trial court of an error it was given no oppor-

tunity to correct. *State v. Lewis*, 243 S.W.3d 523, 525 (Mo.App.2008).

7. Defendant's point relied on also claims error in denying his request for a curative instruction. The record reveals that counsel did *not* request a curative instruction. Moreover, Defendant did not argue in his brief that he was entitled to a curative instruction, thereby abandoning that alleged error. *State v. Woodson*, 140 S.W.3d 621, 627 (Mo.App. 2004).

*State v. Kezer*, 918 S.W.2d 874, 880 (Mo. App.1996) (evidence of gang membership not introduced for the sole purpose to inflame the jury, but relevant and had substantial probative value to show relationships with other gang members and access to guns); *see also State v. Turner*, 242 S.W.3d 770, 778 (Mo.App.2008) ("[g]enerally, mere evidence of gang membership, without more specific evidence, is too vague to constitute evidence of prior crimes or bad acts").

■ Moreover, even if the prosecutor's comments were improper, Defendant has failed to show that in the absence of the comments, there is a reasonable probability the verdict would have been different. *Smith*, 32 S.W.3d at 552. The evidence against Defendant included his own admission that he was at the scene and the testimony of three witnesses who identified Defendant as the man running down the alley away from Victim's home. Defendant also admitted to Ward that he shot Victim until she was dead. Defendant has failed to demonstrate any reasonable basis for this Court to conclude that the prosecutor's comments had a decisive effect on the verdict. *Id.* at 553; *see Miller*, 226 S.W.3d at 269 (given evidence of guilt, defendant failed to show how the state's closing argument had any decisive effect on the jury). We further note that the jury was properly instructed to determine the facts only from the evidence, and that "[j]urors are presumed to follow the court's instructions." *State v. Forrest*, 183 S.W.3d 218, 230 (Mo. banc 2006); *Vanlue*, 216 S.W.3d at 735; *Smith*, 32 S.W.3d at 553. Point III is denied.

### Point IV

In Defendant's fourth point, he contends the trial court abused its discretion in failing to grant his request for a mistrial when the prosecutor elicited certain testimony concerning other murders from Ward, who was called as a witness by the State. This claim of error arises from the following events. Prior to trial, Defendant filed a motion in limine to preclude evidence of other crimes. Specifically, Defendant sought to bar evidence regarding the charge in Texas for which he was serving a sentence and evidence regarding the murders of Paris Harbin and Chandy Plum in Jasper County, Missouri. The court granted the motion in limine.

In Defendant's opening statement, defense counsel stated that "one of the main parts" of the State's case would be Ward's testimony. Defense counsel then stated:

What [the prosecutor] told you is that [Ward] just had a change of heart about things, that he's serving time in a federal penitentiary on a drug case, that he wasn't promised anything, but what [the prosecutor] didn't tell you about was something called a proffer agreement, something called a downward departure. At the time that [Ward] had this change of heart and started cooperating with the federal and state government he had a death penalty case hanging over his head. They don't tell you that.

At trial, the State called Ward to testify that: (1) McDaniel had wanted Victim killed; (2) McDaniel wanted Defendant to do it; and (3) Defendant later admitted that he had killed Victim. The prosecutor then began eliciting evidence about Ward's prior convictions. In the course thereof, the following colloquy occurred:

Q. Now, however, when you first spoke with the police you were arrested for a murder charge, isn't that correct?

A. Yes.

Q. The murder involving two people in Joplin, Plumb and Harbin, in 1989(sic), you were arrested for that, is that correct?

A. Yes.

Q. All right. And you were arrested, and they questioned you regarding that murder, correct?

A. Yes, they did.

Q. And, in fact, you got indicted for that murder, am I right?

A. Yes, I did.

Q. And do you know who falsely accused you of committing the murder in 1989? (sic) Who was the man that said Israel Ward killed Plumb and Harbin?

A. Brian McDaniel.

Q. So Brian McDaniel set you up to be indicated for a murder charge, am I right?

BY [DEFENSE COUNSEL]: Objection, Your Honor.

BY THE WITNESS: Yes, he did.

BY [DEFENSE COUNSEL]: May we approach?

BY THE COURT: You may.

(BENCH CONFERENCE HELD)

BY [DEFENSE COUNSEL]: I move for a dismissal at this time. In the alternative I move for a mistrial. It was my understanding that Plumb–Harbin was off limits.

BY THE COURT: It's my understanding I thought we were not going to discuss that.

BY [PROSECUTOR]: Well, I think that motion in limine, Your Honor, it has to be raised by objection at trial. It's an interrogatory [sic] order.

BY THE COURT: You were to approach sidebar prior to discussing it.

BY [PROSECUTOR]: I don't remember that instruction. I apologize.

BY THE COURT: All right. I will not be declaring a mistrial. Are you asking for any other remedy?

BY [PROSECUTOR]: Well, Your Honor,—

BY THE COURT: I want the record to be clear, frankly, your motion is a little

untimely. The answer was already given prior to your objection. Probably should have raised it earlier, so the record is clear. I will certainly instruct them—

BY [DEFENSE COUNSEL]: I ask that the prosecutor be ordered to preclude from any further reference to that case.

BY THE COURT: Do you wish me to instruct the Jury to disregard any testimony given on that question?

BY [DEFENSE COUNSEL]: Yes.

BY [PROSECUTOR]: I can talk about a murder, but not Plumb and Harbin, right? Because they have said he is out for retaliation, and I've got to be able—

BY THE COURT: They haven't said anything.

BY [DEFENSE COUNSEL]: I didn't say anything.

BY THE COURT: They have made some opening statement, but that's not evidence.

BY [PROSECUTOR]: Okay. Very well.

BY THE COURT: They have to open the door.

BY [DEFENSE COUNSEL]: I don't even think I said that in opening. I don't think you were here during opening, for one thing.

BY [PROSECUTOR]: Yeah. I was here.

BY THE COURT: So we're clear, the prosecutor is not going to go into this area any further. I'm going to instruct them to disregard the last answer, question and answer.

(BENCH CONFERENCE CONCLUDED)

BY THE COURT: Thank you, ladies and gentlemen. The Jury will disregard the last question and answer given by the witness. You may proceed.

During Ward's cross-examination by defense counsel, the following exchange took place:

Q. Okay. Now, when you were—now, you were charged with a murder?

A. With the murder of Chandy Plumb.

BY THE COURT: Approach.

(BENCH CONFERENCE HELD)

BY THE COURT: Weren't you the person that came sidebar asking for a mistrial just a second ago?

BY [DEFENSE COUNSEL]: Yes.

BY THE COURT: Did you not understand or object to the same procedure that I have a motion in limine in place?

BY [DEFENSE COUNSEL]: I guess I did.

BY THE COURT: Did you not just do exactly what the prosecutor did?

BY [DEFENSE COUNSEL]: I did not ask him specifically. He volunteered that information.

BY THE COURT: What did you think he was going to say?

BY [DEFENSE COUNSEL]: I figured he would say yes.

BY THE COURT: All right. At this point based upon the actions of both counsel unless you both agree to the limine remaining in place the door is open for both to inquire. What's your positions?

BY [DEFENSE COUNSEL]: Let's just leave it in place and I'll back away from it.

BY [PROSECUTOR]: No, I want to inquire.

BY THE COURT: Both will agree or the motion remains in place.

(BENCH CONFERENCE CONCLUDED)

BY THE COURT: The Jury will disregard the last question and answer. You may proceed.

Following a recess, the prosecutor asked the court to be permitted to tell the jury that the murder charges against Ward for the Plum–Harbin murders had been dismissed because Ward had provided an alibi. The court granted the prosecutor's request and further ruled that defense counsel could adduce evidence that the murder charge was still pending when Ward initially cooperated with the investigation in this case. On redirect examination of Ward, the State established that: (1) McDaniel had wrongly accused Ward of the unrelated murder; (2) he had been arrested and indicted for the murder; but, (3) ultimately the murder charge was dismissed because he was able to establish an alibi. The dismissal did not result from Ward's cooperation with the government.

■ In Defendant's final point, he contends the trial court abused its discretion in overruling his motion for a mistrial "because the prosecutor improperly bolstered the credibility of its own witness, Israel Ward" by eliciting testimony from him that McDaniel, rather than Defendant, had wrongly accused Ward of an unrelated murder. Defendant implies that such proof would have led the jury to believe that Ward had no motive to testify against Defendant and that nothing short of a mistrial would have cured the prejudice to Defendant. The State argues that Defendant has failed to preserve this point for appellate review. This Court agrees.

■ When defense counsel first objected, there had already been considerable questions and answers of Ward concerning the Plumb–Harbin murders. For that reason, the objection was untimely. *State v. Willis*, 10 S.W.3d 156, 158 (Mo.App. 1999). More importantly, no grounds for the objection were stated. Simply stating the word, "objection," preserves nothing for appellate review. *State v. Anderson*, 79 S.W.3d 420, 440 n. 8 (Mo. banc 2002). On appeal, Defendant claims the trial court should have granted a mistrial due to im-

proper bolstering. That specific objection, however, was never presented to the trial court for a ruling.[8] As Defendant is limited on appeal to the objections raised before the trial court, this point is not preserved for appellate review. *See State v. Driver*, 912 S.W.2d 52, 54 (Mo. banc 1995); *State v. Hoy*, 219 S.W.3d 796, 809 (Mo. App.2007). In *Hoy*, this Court recently summarized the reason for this rule:

> Preservation of evidentiary questions for appeal requires an objection at the time the evidence is sought to be introduced along with the same objection being carried forward on appeal. An objection to the admissibility of evidence must be specific. The purpose of this rule is to ensure that the trial court is informed of the reasons of the objection so that it can thereby make a reasoned and informed ruling. Any grounds that are not raised in the objection are considered waived, and a party is prevented from raising such grounds for the first time on appeal. Changing the grounds for the objection or broadening the grounds is also prohibited.

*Hoy*, 219 S.W.3d at 809 (citations omitted). Point IV is denied.

The judgment of the trial court is affirmed.

PARRISH, P.J., and SCOTT, J., concur.

8. Defendant's motion for new trial also included no claim that the trial court should have granted a mistrial due to improper bolstering of Ward's testimony.