**STATE of Missouri, Plaintiff–Respondent,**

v.

**Michael Charles MILLER, Defendant–Appellant.**

No. 27997.

Missouri Court of Appeals, Southern District, Division Two.

June 22, 2007.

Kent Denzel, Assistant Public Defender, Columbia, MO, for Appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Joshua N. Corman, Assistant Attorney General, Jefferson City, MO, for respondent.

GARY W. LYNCH, Judge.

Michael Charles Miller ("Defendant") was found guilty by a jury of committing the Class B felony of manufacturing methamphetamine, a controlled substance, in violation of Section 195.211.[1] He was convicted and sentenced as a prior and persistent drug offender to serve fifteen years in the Missouri Department of Corrections. Sections 558.016 and 558.011. Defendant appeals, arguing the trial court erred in overruling his objection during the State's closing argument, when the prosecutor allegedly misstated the evidence. Because we find that the prosecutor's argument was a reasonable inference from the evidence and that the verdict would not have been different had the trial court not overruled the objection, we affirm Defendant's conviction.

## 1) *Factual and Procedural Background*

Defendant does not challenge the sufficiency of the evidence to support his conviction. Viewing the evidence in the light most favorable to the conviction, *State v. Stanley,* 124 S.W.3d 70, 72 (Mo.App.2004), the following evidence was adduced at trial.

On January 6, 2004, Officer David Stretch of the Springfield Police Department received information from a confidential source that there was potential drug activity at an address within a trailer park in Springfield. Later that morning, Officer Stretch met Officer Chris Welsh and Officer Jonathan Shuck at the address. All three officers had received training in recognizing clandestine methamphetamine labs. The officers approached the trailer on foot and noticed the smell of ether. This caused them some concern because ether is a major component in the manufacture of methamphetamine and is dangerous due to its explosive nature. Officer Stretch knocked on the door of the trailer, and after a few minutes Defendant came to the door. When he opened the door, the smell of ether became stronger. Officer Stretch told Defendant that they were there to investigate potential drug activity. Defendant stepped outside and shut the door behind him. Defendant appeared to be "extremely nervous." When Officer Stretch asked Defendant if they could come inside, Defendant asked them where their information came from. Defendant continued to ask repeatedly where their information came from and then abruptly told the officers to "come on" and went inside the trailer. The officers followed him inside, and Defendant immediately went to the refrigerator. He opened the freezer door, pulled out a glass jar, set it

---

1. All references to statutes are to RSMo Cum. Supp.2004, unless otherwise noted.

on the counter and said, "It's ether, this is all that I have."

At that point Officer Welsh asked Defendant for consent to search the trailer for drugs, and Defendant said, "Go ahead." Officer Welsh began searching the kitchen, where he found a box of rock salt and a bottle of drain opener under the sink. Both of these items are used in the manufacturing of methamphetamine. On the kitchen counter, Welsh discovered five used coffee filters with a white, powdery substance on them. Coffee filters are also items used in the manufacturing of methamphetamine. The white, powdery substance indicated to Officer Welsh that they had been used to filter out the powder from pills containing ephedrine or pseudoephedrine. To the left of the coffee filters and next to the stove, Officer Welsh found a glass baking dish with a burnt white-with-a-greenish-tint substance in the bottom. Welsh recognized it as a part of the process of manufacturing methamphetamine. On top of the refrigerator Officer Welsh found a two-liter bottle partially full of a liquid with a whitish sludge at the bottom. The liquid and the sludge indicated to Officer Welsh that the bottle was being used as a "pill wash." A "pill wash" is a two-liter bottle commonly used in the manufacture of methamphetamine to mix a liquid solvent with pills containing ephedrine or pseudoephedrine, in order to extract the ephedrine or pseudoephedrine from the pills. In the living room just adjacent to the kitchen, Officer Welsh also found a small propane bottle. As a result of the products of Officer Welsh's search, Defendant was arrested, and a narcotics expert, Officer Josh McCain, was called to come collect the evidence. The whitish-greenish substance in the glass dish tested positive for methamphetamine. Thereafter, Defendant was charged with manufacturing a controlled substance in violation of Section 195.211.

Officer McCain testified at trial that Defendant had all of the essential items he needed to manufacture methamphetamine using the "birch reduction" method. This method begins with cold pills containing the active ingredient ephedrine or pseudoephedrine. The active ingredient is extracted from the pills by mixing them with a liquid solvent such as methanol, acetone, alcohol, or water. This is typically done in a two-liter bottle called a "pill wash." The ephedrine or pseudoephedrine separates from the powdery binding agents which settle to the bottom of the bottle. The contents of the "pill wash" are then poured over coffee filters to separate the powdery binding agents from the liquid containing the ephedrine or pseudoephedrine. Next, the liquid solvent has to be evaporated off of the extracted ephedrine or pseudoephedrine. This step is usually sped up by using a heat source, such as a stove or a small torch, which results in a dried powder containing the ephedrine or pseudoephedrine. Then anhydrous ammonia is added to the powder along with an alkaline metal, usually lithium which is commonly found in batteries. At that point, methamphetamine is formed. The whitish-greenish substance in the glass dish found in Defendant's kitchen was the result of these steps. The substance in the dish tested positive for methamphetamine.

To get the methamphetamine into a "street worthy" form that users will buy, it has to be crystallized into powder form. This is done by adding water to the methamphetamine, and then adding ether, which draws out all of the methamphetamine oil from any remaining lithium or anhydrous ammonia. An "acid generator" is then used to bubble hydrogen chloride gas through the ether-methamphetamine solution. An "acid generator" is any container with a mix of rock salt and sulfuric acid, which is found in drain cleaner. The

rock salt and the sulfuric acid from the drain cleaner react to form hydrogen chloride gas, which causes the methamphetamine to settle out into crystals, resulting in a cleaner, more stable product. Ether, rock salt, drain cleaner, and methamphetamine "base"—in the glass dish—were all found in Defendant's kitchen.

Defendant did not testify at trial but presented one witness, his mother, in his defense. During the State's closing argument Defendant objected to a statement made by the prosecutor, which is the subject of this appeal. The court overruled that objection. At the close of the evidence and arguments, the jury found Defendant guilty of manufacturing methamphetamine. Thereafter, the court sentenced Defendant as a prior and persistent drug offender to fifteen years' imprisonment. Sections 558.016 and 558.011. This appeal followed.

## 2) *Standard of Review*

"The trial court has broad discretion in controlling the scope of closing argument and the court's rulings will be cause for reversal only upon a showing of abuse of discretion resulting in prejudice to the defendant." *State v. Taylor*, 134 S.W.3d 21, 27 (Mo. banc 2004). "Even if the prosecution's argument was improper, reversal is appropriate only if it is established that the comment of which [the defendant] complains had a decisive effect on the jury's determination." *State v. Storey*, 40 S.W.3d 898, 910 (Mo. banc 2001). "In order for a prosecutor's statements to have such a decisive effect, there must be a reasonable probability that the verdict would have been different had the error not been committed." *Taylor*, 134 S.W.3d at 27. "The burden is on the defendant to prove the decisive significance." *State v. Parker*, 856 S.W.2d 331, 333 (Mo. banc 1993).

## 3) *Discussion*

In his only point on appeal, Defendant alleges the trial court abused its discretion in overruling Defendant's objection to a statement made by the prosecutor during the State's closing argument. Defendant claims the prosecutor argued facts not in evidence and misstated evidence from witness testimony. The statement at issue relates to the small propane bottle Officer Welsh found in Defendant's trailer. At trial, Officer Welsh testified he believed the small propane bottle was potential evidence of manufacturing methamphetamine. Officer McCain, the narcotics expert who collected the evidence, also testified he believed the propane bottle was connected to the manufacture of methamphetamine in Defendant's trailer.

Matthew Lepper, a criminalist with the Missouri State Highway Patrol, testified that anhydrous ammonia is similar to propane, in that it is stored in liquid form, but it becomes a gas when it is released. Like propane, anhydrous ammonia creates its own pressure, so it does not have to be stored in a pressurized container. He explained that anhydrous ammonia is typically in a farm setting where it is used as a fertilizer, stored in large "nurse tanks" which have heavy metal walls that can withstand the pressure created by the anhydrous ammonia in its liquid form. But anhydrous ammonia can be stored in any sort of container or jar; as long as it is contained it will have enough pressure in it to remain a liquid "for a while."

In his closing argument, Defendant's counsel made the following arguments:

How much anhydrous ammonia did they find? [The prosecutor] admitted zero, zip, zilch, nada, nothing. Anhydrous. How many tanks or containers of anhydrous ammonia? None, containers. Once again, the only inference according

to the government, it was used up. It disappeared but we know it was there. It's not there; therefore, we know it was there.

Let's test some of the reason. According to the state, when anhydrous ammonia is not under pressure at normal temperature, it dissipates into the air. Mr. Lepper stated that on farms, it has to be held in huge metal thick tanks because of the pressure that builds up. Now also, he said that he could put it into any other container for a short period of time. Now that really is curious to me. I wonder if I can go down to Race Brothers Farm Supply with my Mason jar and say, "Hi, can I get a cup of anhydrous?" Of course you can't, it's sold in tanks and besides you try to take it out of a tank and put it in a jar, what's going to happen? According to their witness, according to their scientist, it's going to dissipate into the air. You've got to have a system for getting it out of a tank and putting it into a container or you've got to have a tank of anhydrous. They don't have it....

\* \* \*

Did anyone present to you a container that could, even for short periods of time, hold anhydrous? They know what to look for, they know. Where is the container?

In his rebuttal argument, the prosecutor responded:

And then there's that propane bottle. Let's talk about that for a minute. [Defense counsel] went on and on really stressing in evidence how there was no anhydrous ammonia. There wasn't anything there and so he couldn't have made methamphetamine. And how is anhydrous ammonia stored? Well Lepper told you that, right? Well, what else—evidence did you hear about the way this methamphetamine was made?

Officer McCain told you, yeah, you could use a propane torch for a heat source but that's not what this was. This was a stove cook. He told you that. That was the evidence.

So what about that propane bottle that [Defense counsel] talked about, right? Think back to what Matt Lepper told you. Those giant nurse tanks that hold anhydrous have to be pressurized to keep it in a liquid form. What else can you store it in? Can you store it in a container with a lid? Yeah, that'll work, but usually people will take it and put it into a what, pressurized tank, a smaller pressurized tank.

[Defense Counsel]: Objection, Judge. There was no testimony that that tank was used as a container at all.

[Prosecutor]: Judge, I'm arguing the logical inference that can be drawn from the evidence from Mr. Lepper.

[Defense Counsel]: There was no evidence that that was tampered with at all.

[COURT]: Overruled.

[Prosecutor]: All right. Pressurized tanks. Now, what did Matt Lepper say? People store it in what? Propane tanks. Hold something under pressure, there it is. And I want you to notice something about that propane bottle. It was used for heating the pipes, right? That's what [Defendant's mother] said. Where is the burner on top of that torch, folks? How are you going to heat pipes with that? Pressurized container, anhydrous.

Now, the fact of the matter is is that Officer McCain took all those things and destroyed them. He had to because meth labs are exceedingly dangerous. They're explosive in nature. That's what you have to do with a methamphetamine lab, you have to destroy that. So I can't tell you yep, it tested positive for anhydrous, but use your common sense.

Draw reasonable inferences from the evidence that's presented. That's the evidence. It makes sense[,] too.

Defendant claims that the prosecutor was permitted to argue facts outside the record and essentially testify without being sworn or subjected to cross-examination when he stated that the propane bottle found in Defendant's trailer could be used to store anhydrous ammonia. Defendant argues that there was "nothing in the evidence to suggest that the bottle from a propane torch could be used to hold anhydrous ammonia." Defendant further argues that the prosecutor misstated the evidence in saying that Matthew Lepper testified that people put anhydrous ammonia in propane tanks, because Lepper "did not say a word about propane bottles."

 "The State, just like the defense, has wide latitude in drawing inferences from the record when presenting its closing argument." *State v. Forrest*, 183 S.W.3d 218, 228 (Mo. banc 2006). A prosecutor has the right to draw any inference from the evidence which he or she believes in good faith to be justified, and may call upon common experience. *State v. Delaney*, 973 S.W.2d 152, 156 (Mo.App.1998). The prosecutor also has the right to provide the State's view on the evidence and the credibility of witnesses. *State v. Mishler*, 908 S.W.2d 888, 894 (Mo.App.1995). "When responding to an issue raised in the defendant's closing argument, the prosecutor can go further than the normal bounds of closing arguments." *State v. Griffin*,

202 S.W.3d 670, 683 (Mo.App.2006). "A prosecutor may retaliate to an issue raised by the defense even if the prosecutor's comment would be improper." *State v. Sanchez*, 186 S.W.3d 260, 265 (Mo. banc 2006).

In this case, the State's argument was not improper in that it was rebutting the remarks made by Defendant's counsel that no one had produced a container that could hold anhydrous ammonia. *See id.* The prosecutor answered defense counsel's question of "Where is the container?" by making a logical inference from the evidence, suggesting that the propane bottle could have been used to hold the anhydrous ammonia. Evidence was presented through Matthew Lepper's testimony that anhydrous ammonia and propane are similar, and that they are stored similarly in pressurized tanks. It was reasonable for the prosecutor to infer and suggest to the jury that the propane bottle could have been used to hold anhydrous ammonia. He acted within his right to present the State's view on the evidence, and to ask the jury to call upon their common sense. Thus, under the first prong of our analysis, we find that the trial court did not abuse its discretion in overruling Defendant's objection.[2]

 While our finding under the first prong is sufficient to deny Defendant's point on appeal, we also find, under the second prong of our analysis, that even if the trial court did abuse its discretion, Defendant did not suffer any prejudice as

---

**2.** We recognize that portions of both sides' arguments read with some rather awkward language. During trial, the State admitted Exhibit 8, a chart illustrating the steps in the methamphetamine manufacturing process. The police officers used this chart to aid their testimony. Defense counsel was apparently referring to this chart during his closing argument, and the prosecutor likely was as well.

This explains the one-word sentences and strange transitions in their arguments. It also makes us all the more hesitant to overturn the trial court's ruling, when the trial court was in the best position to observe and interpret the attorneys' actions and arguments. *State v. Hashman*, 197 S.W.3d 119, 134 (Mo.App.2006).

a result of the trial court's action. *See Storey,* 40 S.W.3d at 910–12. Defendant argues that the prosecutor's statement had a decisive effect on the jury's verdict, because "the jury did not consider this to be a case of overwhelming evidence." This argument is without merit. "[C]losing arguments must be interpreted with the entire record rather than in isolation." *Id.* Defendant fails to show how the State's closing argument had any decisive effect on the jury, given the overwhelming evidence of his guilt. The evidence showed that Defendant had methamphetamine already formed in the glass dish in his trailer. The fact he had coffee filters with a white, powdery substance in them, a bottle appearing to be a "pill wash," and methamphetamine in its "base" or pure form in a burnt glass dish on the stove indicates Defendant manufactured the methamphetamine in his trailer. The fact he had the components necessary to purify the methamphetamine into "street worthy" crystallized form—the ether, rock salt, and drain cleaner—further indicates he had manufactured the methamphetamine. He had manufactured the methamphetamine into its pure form and was getting ready to crystallize it. The bottom line is that the methamphetamine had already been formed in the glass dish, and the various items found in Defendant's trailer that are commonly used in the manufacturing process indicated that Defendant had manufactured it. In light of that overwhelming evidence of Defendant's guilt, there is no probability that the verdict would have been different had the court sustained Defendant's objection to the prosecutor's comments on the propane bottle. Consequently, Defendant suffered no prejudice by the trial court's failure to sustain Defendant's objection, even if such failure was an abuse of discretion. Defendant's point is denied.

### 4) *Decision*

The judgment of the trial court is affirmed.

BATES, P.J./C.J., and BARNEY, J., concur.