**STATE of Missouri, Plaintiff–Respondent,**

v.

**Jillian Michelle CANNADY, Defendant–Appellant.**

No. SD 31771.

Missouri Court of Appeals, Southern District, Division One.

Jan. 25, 2013.

Emmett D. Queener, Columbia, for Appellant.

Chris Koster, Atty. Gen., Gregory L. Barnes, for Respondent.

NANCY STEFFEN RAHMEYER, J.

Jillian Michelle Cannady ("Appellant") appeals her conviction for first-degree assault, section 565.050,[1] in attempting to cause and thereby causing serious physical injury to Kelly Halphin ("Victim") by throwing hot cooking grease on her. On appeal, she challenges that the trial court plainly erred in failing to *sua sponte* correct a statement made during the State's closing argument that Appellant had "wanted to do this for a long time," and in admitting photographs of Victim's injuries, taken by her sister, to document the progression of her recovery. We find no error, plain or otherwise, and affirm the judgment of the trial court.

### Factual and Procedural Background

For eight years, Victim was in a romantic relationship with Lance Hill. At the time of the incident, she and Hill had two children and, at the time of trial, she was expecting a third child also fathered by Hill. In July 2009, Victim and Hill ended their relationship, and Hill moved into his parents' home after he was released from a prison treatment program. Appellant also had two children with Hill and, in late 2009, she and her three children, one not fathered by Hill, resided "off and on" at Hill's parents' home. Appellant and Victim were familiar with one another and, on several occasions, they and their children lived together. Victim testified that she and Appellant never had a good relationship, but they "tried to get along"; however, Michael Harris, Hill's half-brother, testified that Appellant's attitude changed every time Victim came around.

Around 2:30 or 3:00 a.m., on the day of the incident, a neighbor drove Victim to Hill's parents' home. Victim had been in contact with Hill the day before through Appellant because Hill did not have a phone, but she did not call before going over to the home that morning. Victim testified that it was not unusual for her to show up unannounced at that time of day. When Victim arrived, the door was unlocked and the lights were on, but no one appeared to be awake. Victim entered the home and went straight upstairs to a bedroom where Hill was sleeping. She woke Hill up, and he agreed to go back to her apartment with her.

Hill and Victim went downstairs to retrieve car keys from Hill's cousin so they could drive to Victim's apartment. At that time, Appellant was in the kitchen eating.[2] As Hill and Victim passed through the kitchen, Hill and Appellant started yelling at each other. Victim did not say anything to Appellant and proceeded through the kitchen to find the keys. As Victim returned with the keys, she saw Appellant stab a knife into the countertop.

Hill and Victim proceeded out of the house towards the vehicle. Hill decided to spend the night with Victim, so they went back inside the house to collect some

---

1. All statutory references are to RSMo 2000, unless otherwise indicated. All rule references are to Missouri Court Rules (2012).

2. After the incident, there was no evidence that Appellant had been cooking anything.

clothes for him to take to Victim's apartment. While searching for his clothes, Victim and Hill woke up Michael Harris, Hill's half-brother, who was sleeping in one of the upstairs bedrooms. Victim and Hill stayed and visited and drank beer with Harris for about an hour and a half. While they were visiting, Victim commented that she smelled grease, but no one went downstairs to investigate the odor. At one point while they were visiting, Harris went downstairs to use the restroom. As he was coming down the stairs, Appellant stopped him and directed him to use the bathroom in the master bedroom near the bottom of the stairs instead of using the back bathroom through the kitchen. When he came out of the bathroom, Appellant was covered up in the bed in the master bedroom, and he returned back upstairs to Hill and Victim.

Around 5:00 a.m., Victim and Hill prepared to leave because they needed to pick up their children from the babysitter by 8:00 a.m. Victim headed down the stairs ahead of Hill and Harris, and when she was a few stairs from the ground floor hot grease was thrown in her face. She had not seen Appellant because it was dark at the bottom of the stairs. Victim fell down the remaining steps, and Appellant began hitting her on the head with a pot and yelling at her. Hill came down the stairs and pulled Appellant away from Victim. Appellant went up the stairs, carrying a knife in her hand, and passed Harris, saying "I got that B, I got that B." Harris testified Appellant had a crazy look on her face, a look "that will make you nervous" and "like a death look to me."

Victim was burned on her entire face, her neck down to her left breast, all down her left arm, all of her back, and the lower left side of her stomach. Victim testified that after the attack she felt like she was on fire. She was in shock and did not

know what to do, but she could not stand the heat on her anymore, so she took everything off the top part of her body, including her jacket, two shirts, and her bra, and apologized to two members of the household who were watching. Victim's South Pole coat was drenched in grease, her long white shirt underneath her burgundy T-shirt had grease all over it, her maroon T-shirt had grease all over it, her black bra had grease on it, her blue jeans had grease all down the front, and her underwear also had grease on them. Victim still felt like she was burning even when she went outside despite the cold and snow all over the ground.

Hill took her to the hospital where she was treated for three days in a hospital burn unit for second-degree burns to her face, neck, and the left side of her upper body including her shoulder, chest, arm, and fingers. The injuries were severe and eventually required a skin graft to her arm. An officer took photos of Victim while she was being treated in the hospital on the night of the incident. After Victim was released from the burn unit, her sister came to live with her to help administer her at-home care. Her sister also took numerous photographs documenting the progression of Victim's injuries from the time of the incident through March, after the skin graft was completed.

Officers located Appellant hiding in the home's detached garage and apprehended her. Her shirt had grease splatters on its front. Officers also documented substantial grease splatters on the walls of the staircase and pooled grease on the carpet at the foot of the stairs. An officer testified that the grease splatters were "above head high" on the walls. The pot was found in the upstairs bedroom.

A jury found Appellant guilty of first-degree assault, and the trial court sen-

tenced Appellant to fifteen years. This appeal timely follows.

### Analysis

In her first point, Appellant states:

[t]he trial court abused its discretion and plainly erred by failing to *sua sponte* correct the prosecutor's closing argument and instruct the jurors to disregard the closing argument that [Appellant] had planned for a long time to throw hot grease on [Victim] and disfigure her ... in that there was no evidence to support the prosecutor's argument and it was prejudicial in that it allowed the jurors to convict [Appellant] for matters not supported by the evidence.

At the outset, Appellant concedes that she did not object to this statement during the closing argument, nor did she raise the issue in her motion for new trial; therefore, she requests plain error review under Rule 30.20. Plain error review is used sparingly only in those limited cases where there is a clear demonstration of manifest injustice or miscarriage of justice. *State v. Vanlue,* 216 S.W.3d 729, 733 (Mo.App. S.D. 2007). Plain error review involves two steps: we must first determine whether Appellant's claim, on its face, establishes substantial grounds for believing that manifest injustice or miscarriage of justice has occurred, and, if so, we exercise our discretion to review Appellant's claim to determine whether the manifest injustice or miscarriage of justice actually occurred. *State v. Kennedy,* 107 S.W.3d 306, 312–13 (Mo.App. W.D.2003). Appellant must show more than prejudice to warrant relief; the error must be evident, obvious, and clear. *Id.* at 313.

"Plain error will seldom be found in unobjected closing argument." *Vanlue,* 216 S.W.3d at 734 (internal quotations and citations omitted). "[C]ourts hesitate to find plain error in a failure to *sua sponte* correct a statement made during closing arguments because trial strategy looms as an important consideration in deciding whether to object during closing argument." *Kennedy,* 107 S.W.3d at 313 (internal quotations and citations omitted). The court runs the risk of creating error by interfering. *Id.* Therefore, alleged errors in closing argument do not justify relief under the plain error rule unless they are found to have a decisive effect on the jury. *Id.*

The prosecutor's statement during closing argument that "[Appellant] had wanted to do this for a long time" does not, on its face, establish substantial grounds for us to believe that a manifest injustice or miscarriage of justice has occurred. The State has wide latitude in drawing reasonable inferences from the evidence during closing argument. *State v. Miller,* 226 S.W.3d 262, 268 (Mo.App. S.D.2007). The prosecutor is given even more latitude when responding to issues raised in the defendant's closing argument. *Id.*

Here, the evidence supported the inference that Appellant had wanted to harm Victim—there was testimony that their relationship "wasn't always the best[,]" that Appellant's attitude would change when Victim and her children would come around, and that she was jealous of Victim's relationship with Hill. There was also testimony that after she threw the grease on Victim, she told Harris, "I got that B, I got that B." Moreover, Appellant maintained during trial that she accidentally threw the grease on Victim and, during closing arguments, defense counsel referred to the incident as "an accident ... plain and simple[,]" and explained the extent of the grease splatter on the walls as "a knee-jerk reaction[.]" The State was entitled to respond to these arguments in

its own closing argument by drawing inferences from the evidence, as it did. When the argument is viewed in toto, the State made simple inferences from the facts by stating:

You heard Michael Harris tell you, when [Appellant] came running up those stairs after hearing [Victim] scream, [Appellant] had a knife in her hand[.] Ladies and gentleman, this was not an accident.

She would have you believe this amicable relationship, that she was okay letting the man, the man that she's dating, the man who solicited sex from her earlier that evening, that she was okay with him leaving at 3:00 in the morning with the mother of his children, that she was okay with him spending the night with that woman later on. That's fine. She has no trouble with that. Ladies and gentleman, that's not true, because you heard Michael Harris tell you how her attitude changes every time [Victim] comes around.

. . . .

She wants you to believe that this grease, this half a pot of grease that was thrown on [Victim], that was accidentally thrown on her in a dark hallway, was only seen by her, how it happened. She wants you to believe that in that dark hallway, where no one else can see, she was clearly able to see [Victim] walk downstairs and touch the pot with the only finger that is burned, and that after that happened, the grease spattered up onto her clothing and caused her a reaction to throw it up the stairway. That doesn't make sense.

If she were burned with grease, what would the response be? To drop the pot, not to throw it, while she is so frail and ill, up the staircase, onto [Victim], who is at the bottom of the staircase.

If [Victim] is reaching down and touching this pot, how did the oil end up all over [Victim's] head and face and body and up the stairwell? It ended up that way because that's where [Appellant] threw it. She threw it on [Victim] as she was coming down the stairs, because she was mad. She was mad that the man that she thought was her boyfriend, or wanted to be her boyfriend, was leaving with that woman.

We're not saying that she knew that [Victim] was coming over and that she had planned to do this, but this didn't happen in twenty minutes. She knew Kelly was there, she knew that they went back upstairs, and she started heating up her pot of oil. She had wanted to do this for a long time.

Because the alleged error does not facially amount to a manifest injustice or miscarriage of justice, we decline to exercise plain error review. Point one is denied.

Appellant contends in her second point: [t]he trial court abused its discretion in overruling [Appellant's] objection and admitting the photographs taken by [Victim's sister], State's Exhibits 82 through 138, into evidence, ... in that the evidence was logically and legally irrelevant because they were cumulative of other evidence presented at trial and were more prejudicial than probative.

The trial court has broad discretion to admit photographs, and we will not overturn its decision absent an abuse of discretion. *State v. Sperling*, 353 S.W.3d 381, 383 (Mo.App. S.D.2011). "An abuse of discretion occurs when the trial court makes a ruling that is clearly against the logic of the circumstances before it and the ruling is so arbitrary and unreasonable as to shock one's sense of justice and indicate a lack of careful consideration." *Id.* (internal quotations and citations omitted).

"Photographs are admissible if they accurately and fairly represent what they purport to depict and tend to prove or disprove any of the elements of the charged offense." *State v. Jaco,* 156 S.W.3d 775, 778 (Mo. banc 2005). If a photograph is graphic or gruesome, it is because the crime itself was so, and a relevant photograph should not be excluded merely because it is inflammatory. *State v. Mort,* 321 S.W.3d 471, 482 (Mo. App. S.D.2010). Generally, gruesome photographs are admissible if they show the nature and location of the wounds, enable the jurors to better understand the testimony at trial, and aid in establishing an element of the State's case. *Id.* at 482–83. Like other evidence, a relevant photograph should not be excluded unless its prejudicial effect outweighs its probative value. *Sperling,* 353 S.W.3d at 383. We review not for mere error, but to determine if the error was so prejudicial that it deprived Appellant of her right to a fair trial. *Id.*

Appellant was charged with first-degree assault, which required the State to prove that Appellant knowingly caused or attempted to cause Victim serious physical injury when Appellant threw the hot grease on Victim. *See* section 565.050.1. Because the State's amended information charged Appellant with the class A felony of assault in the first degree, it was required to prove not only that Appellant had attempted to commit the crime, but that she also inflicted serious physical injury to Victim in the course thereof. *See* section 565.050.2. Therefore, as part of its burden at trial, the State had to prove that Victim suffered serious physical injury, which is defined as "physical injury that creates a substantial risk of death or that causes *serious disfigurement or protracted loss or impairment* of the function of any part of the body." Section 565.002(6) (emphasis added). The photographs demonstrated the nature of Victim's injuries and assisted the jury in understanding the testimony of Victim, Victim's sister, and Victim's treating physician about the extent and development of Victim's burns. More importantly, the photographs were taken to document the progression of the injuries and the scarring that developed over a three-month period, which is relevant to establishing that Victim suffered "serious disfigurement or protracted loss or impairment" as a result of having hot grease thrown on her.

Although the pictures were gruesome, it is because the crime was gruesome. The pictures showed the nature, location, and severity of the wounds. The photos taken over the period of Victim's recovery were admissible to corroborate, demonstrate, and aid the jury in understanding testimony regarding the severity of the wounds. The trial court did not abuse its discretion in admitting the photographs. Point two is denied.

The judgment of the trial court is affirmed.

GARY W. LYNCH, P.J., and
WILLIAM W. FRANCIS, JR., J., concur.