WILLIAM W. FRANCIS, JR., J.
*63 Jillian M. Cannady ("Cannady") appeals from the judgment of the motion court, following an evidentiary hearing, denying her amended Rule 29.15[1] motion to set aside her conviction for first-degree assault. In two points on appeal, Cannady argues that the motion court clearly erred in denying her post-conviction motion, contending that trial counsel was ineffective for failing to consistently object to hearsay testimony, and that Cannady was prejudiced thereby. Because the motion court's denial of Cannady's Rule 29.15 motion was not clearly erroneous, we affirm.
Facts and Procedural Background
The "facts," for purposes of our review, are derived from the evidence (and reasonable inferences therefrom), when viewed in the light most favorable to the motion court's judgment. Day v. State , 495 S.W.3d 773, 774 (Mo.App. S.D. 2016).
Victim had been romantically involved with Lance Hill ("Hill") for eight years, and he was the father of her two children. The couple broke up in July 2009, and Hill moved in with his mother. Cannady also had two children by Hill, and was staying at the home of Hill's mother during the 2009 Christmas season. Hill's half-brother, Michael Harris ("Harris"), also resided at the household.
On January 9, 2010, at approximately 2:30 a.m., Victim asked a neighbor to take her to where Hill was living. Upon arrival, Victim went directly upstairs to Hill's room, woke him up, and asked him if he wanted to go back to her house and talk about getting back together. Hill agreed to go with Victim.
As Hill and Victim were leaving the house, they encountered Cannady in the kitchen. Hill and Cannady yelled at each other, then Hill and Victim went outside to the car. Once they were at the car, Hill decided to stay the night with Victim, and they went back in the house to retrieve Hill's clothes. Harris woke up and Victim and Hill ended up having a beer and talking to Harris for almost two hours. After approximately 45 minutes, they began smelling grease from the kitchen.
At approximately 5:00 a.m., Victim and Hill decided to leave. Victim began walking down the stairs. As Victim reached the bottom third or fourth stair, Cannady threw a pot of hot grease in Victim's face. Victim started screaming and fell down the rest of the stairs. Cannady then began to beat Victim in the back of the head with the pot while calling her a "stupid bitch."
While police were being called, Cannady ran out the back door. Responding officers found Cannady hiding underneath mattresses in a detached garage behind the house, where she was arrested.
Victim was treated for burns to her face, neck, left ear, chest, back, left arm, and the lower left side of her stomach. Victim later underwent surgery on her left arm requiring skin grafts.
Cannady was charged by amended information with the class A felony of assault in the first degree.
A jury trial commenced on September 26, 2011. Victim testified during the State's case in chief. In her testimony, Victim identified Cannady as the person who threw the hot grease on her. She indicated that she personally knew Cannady, and Cannady and her children had lived with Victim in 2006 and 2008. Victim stated she and Cannady did not have a good relationship, but "tried to get along." She testified she did not see Cannady actually throw the grease in her face as it was dark at the *64 bottom of the stairs. Victim said that after she was hit with the grease, she fell down the remaining stairs and Cannady started beating her in the back of her head with a pot saying, "You stupid bitch." She indicated that she recognized Cannady's voice. Victim's testimony was that Hill then came down the stairs and said, "Jill, what the fuck did you do?" Hill grabbed Cannady off Victim and when Victim stood up, she saw Cannady.
Harris testified that a short time after Hill and Victim left his bedroom, he heard Victim yell "That B burnt me." Harris saw Cannady coming up the stairs with splatter marks on her shirt. Cannady told him, "I go that B, I got that B."
Officer Chad McIntrye ("McIntrye"), with the Springfield Police Department, testified he was a major crimes investigator. He responded to a call at 5:20 a.m. at Hill's residence. He met Hill coming out the door. Officer McIntrye testified that as he approached the house, he smelled an odor like burnt grease. The following colloquy then took place:
[STATE:] Once you approached the house, what did you do?
[MCINTRYE:] Mr. Hill was coming outside. I asked him a few questions, if he lived there. He said he did. He said the mother of his child was burned. I asked where it happened at. He said inside.
[DEFENSE:] Objection. Hearsay.
[STATE:] I would just use this for subsequent conduct, for getting a consent to search and going into the house.
[COURT:] Okay. Have you finished that line of questioning, then, at this point?
[STATE:] I just need to ask a few follow-up questions about how he ended up in the house.
[COURT:] None of it's for the truth of it; is that what you're telling me?
[STATE:] Right.
[COURT:] Objection's overruled.
[STATE:] So you spoke with Mr. Hill about the reason you were dispatched there?
[MCINTRYE:] Yes.
[STATE:] And after he gave you some information, did he subsequently give you consent to search that house?
[MCINTRYE:] Yes.
[STATE:] And did he do so by a signed form or just verbally?
[MCINTRYE:] Both.
[STATE:] Okay. What happened when you went into that house?
[MCINTRYE:] The smell of the grease was stronger, and I just basically did a walk-through. Mr. Hill took me-he told me what had happened. He took me to a stairway and said this is where it happened at, then he took me to a couple other places inside the house.
....
[STATE:] Okay. How did you conduct your investigation, then, as you proceeded through this house?
[MCINTRYE:] At first I just did a walk-through with Mr. Hill, and then I went and got my camera and I just started taking pictures of the interior of the house and the evidence that I found, or thought was evidence.
[STATE:] Okay. What were you looking for as far as items of evidence? You had heard that this was a burn case. Were you looking for specific items that you would believe would be associated with that case?
[MCINTRYE:] Mr. Hill had said that somebody threw grease on her; so, *65 obviously, I was looking for an area that had a large amount of grease or any grease at all, clothes, a container that would hold hot grease, that sort of thing.
[STATE:] Did you have an occasion to go into the kitchen?
[MCINTRYE:] Yes.
Officer McIntyre found a pot in an upstairs bedroom. The pot had a film of oil on it with black residue in the bottom indicating it had been "substantially hot." Officer McIntyre stated he found grease spatters on both walls of the stairway area, which ran down the wall and pooled on the carpet. The grease spatters contained brown or rust colored food debris. The grease spatters went head high if you were standing on the stairs. He testified that it appeared that a substantial amount of grease had been distributed on the walls, and he found nothing else in the house that looked like it would hold hot grease.
Officer Chris Laughlin, ("Officer Laughlin") with the Springfield Police Department, testified that when he arrived at the scene, he smelled an odor of cooking oil coming from the house. The following colloquy then took place:
[STATE:] And do you recall who you and the other officers made contact with first?
[LAUGHLIN:] That would be Lance Hill.
[STATE:] Where did you make contact with Lance Hill?
[LAUGHLIN:] He was the occupant that answered the door and met us there in the doorway.
[STATE:] Did he grant you consent to enter that house?
[LAUGHLIN:] Yes, sir, he did.
[STATE:] And did you enter that house?
[LAUGHLIN:] Yes, sir, we did.
[STATE:] Can you just explain to us what you did when you entered the home?
[LAUGHLIN:] We collectively, as a group, sat there, and we asked them if there was an assault that took place there. Mr. Hill said that there was an assault-
[DEFENSE:] Objection. Hearsay.
[COURT:] Sustained.
[DEFENSE:] Your Honor, any continuing question in that vein would go to the subsequent conduct as to where and what this officer did next. I can move on.
....
[STATE:] You spoke with Mr. Hill?
[LAUGHLIN:] Right.
[STATE:] And after speaking with Mr. Hill, what did you do?
[LAUGHLIN:] Myself and Officer Raby, after there was allegations of an assault, we searched the residence for the alleged suspect.
[STATE:] Did you have any particular location in which you were first searching for that suspect?
[LAUGHLIN:] We initially searched inside the main residence of 1363 East Division.
[STATE:] And you said you entered through the front door?
[LAUGHLIN:] Correct.
[STATE:] She wasn't in the front dining room or living room?
[LAUGHLIN:] No, sir.
[STATE:] Where did you go from there?
[LAUGHLIN:] We searched the ground level of the house. Mr. Hill had stated the last place in which he'd seen the suspect was through the back of the house, so we continued searching *66 through the bottom level of the house, through the-and exited through the rear of the house, still continuing to search for Ms. Cannady.
Officer Laughlin testified that they located Cannady in a detached garage, hiding underneath a couple of mattresses. Cannady was taken into custody at that time.
Officer Victor Raby ("Officer Raby"), with the Springfield Police Department, testified he was dispatched in response to a female that had been burned. He indicated that Officer McIntyre and Officer Laughlin were also at the scene. The following colloquy took place:
[STATE:] Okay. What did you do to assist in this investigation?
[RABY:] When we got there, we contacted the owner of the residence or the resident of the house. He explained to us he was going to the hospital, that his baby's mamma had been burned with chicken grease by a female named Jillian, and she was last seen exiting the house through the rear door. He said he had followed her, but he wasn't able to locate where she was.
[STATE:] Did you assist in processing the interior of the house, or did you go in search of the suspect?
[RABY:] Myself and Officer Laughlin went out the back, to search the back yard. Was unable to find her in the back yard, so we expanded the search into the detached garage that was north of the house.
[STATE:] Did you go through the house before you got into that back yard area?
[RABY:] No, ma'am. We did not search the house.
[STATE:] Okay. Did you pass through-
[RABY:] Yes, ma'am. Yes, ma'am. We went through the front door and exited. We took the same path as she took to go out there.
....
[STATE:] Anything of note as you pass through the kitchen?
[RABY:] He was explaining-Mr. Hill was explaining to the other officers the pan and the grease, but I didn't go into depth on anything like that.
[STATE:] That was not your part of-
[RABY:] No, ma'am.
[STATE:] -this investigation?
[RABY:] No, ma'am.
[STATE:] Okay. Once you went through the house and out the back door, can you describe what you saw out in the back yard?
[RABY:] Back yard is just an open area. It was fenced in with a privacy fence.
[STATE:] And this time of year, January 9th, 2010, was it cold?
[RABY:] It was snowing, yes, or had snow on the ground.
[STATE:] Okay. Once you went back into the yard, where did your search proceed?
[RABY:] To the detached garage on the north side.
[STATE:] And what did you observe when you inspected that detached garage?
[RABY:] As soon as we opened the door, we smelled the strong odor of cigarette smoke, like someone had just been in there smoking. It was full of trash, furniture, had a couple of mattresses to the left side, which would have been the south side. As soon as we started doing a sweep, to make sure anybody was in there, then *67 I noticed Ms. Cannady behind the mattresses.
[STATE:] Okay. Did it appear that anybody was living in this detached garage, or was it a storage area?
[RABY:] It was definitely a storage area.
....
[STATE:] What physical observations did you make about her?
[RABY:] She smelled of cooking oil. It was pretty, pretty strong. She had what appeared to be blotches of cooking oil on her, on her shirt. I asked her if she was injured. She said she had a cut on her hand and a scratch on her neck.
Officer Raby testified that Cannady refused medical care, that he read Cannady her Miranda[2] rights, and that she was transported to the Greene County Jail.
Cannady testified during the defense's case in chief. She stated she was walking toward the front door with the pot of hot grease in her hands-with the intent to dump it outside the front door-when she heard Victim being loud on the stairs. She testified she walked over to the bottom of the stairs to tell Victim to be quiet, when Victim stumbled down the stairs, hitting the pot of hot grease Cannady was holding, and splattering Cannady with the grease. Cannady further indicated that, in a reflex action, she threw the pot away from herself and it struck Victim. Victim began screaming and Hill came out of the bathroom asking what happened. Victim told Hill that "the bitch threw grease on me." Cannady ran upstairs to get her phone to call 911. Hill followed and began choking her; this had happened in the past. Hill released her to go downstairs to see about Victim. Cannady grabbed her purse and a coat, went outside, and hid from Hill in the garage. Shortly thereafter, police found Cannady and arrested her. Cannady stated she did not intentionally try to hurt Victim, and that it was just a bad accident.
After the close of the evidence, the jury found Cannady guilty of assault in the first degree. The trial court sentenced Cannady to fifteen years' imprisonment, as a prior offender.
This Court affirmed Cannady's conviction on direct appeal in State v. Cannady , 389 S.W.3d 306 (Mo.App. S.D. 2013). Mandate issued on February 13, 2013.
On March 12, 2013, Cannady filed a timely pro se Rule 29.15 motion. On January 16, 2015, the motion court appointed the public defender to represent Cannady. On January 30, 2015, the motion court granted appointed counsel an additional thirty days to file an amended motion. Appointed counsel filed a timely amended motion on April 15, 2015.
In her amended motion, Cannady asserted that trial counsel was ineffective for failing to make consistent objections to "hearsay statements," attributed to Hill, and recited in trial testimony by Officer McIntyre, Officer Laughlin and Officer Raby.
On September 28, 2015, the motion court held an evidentiary hearing at which trial counsel and Hill-whose statements to police form the basis for Cannady's claim in this case-testified.
Trial counsel stated it was "[t]rial strategy" that he did not "object to other statements attributed to Mr. Hill" besides the three to which he objected (two successfully, one unsuccessfully). Counsel said his strategy "depended on what the questions were asked by the State and what statements they were trying to elicit from the officer that were attributable to Mr. Hill."
*68 Trial counsel believed that some of Hill's statements supported defense strategy and some did not. As a "general practice," trial counsel testified that he does not ask for curative instructions to the jury to disregard statements after an objection is sustained, because he does not "want to call the jury's attention repeatedly to that comment[.]" Additionally, he indicated that Victim had already testified that Cannady was the person who threw the hot grease on her before any testimony was gleaned from the officers.
Trial counsel stated he "didn't object every single time officers and other witnesses referred to those statements made by Lance Hill" for "the same reason it was overruled at the first time," namely that they were admitted for reasons other than the truth of the matter asserted. Trial counsel stated that it was his belief that all of the unobjected-to statements were admissible, for reasons such as explaining subsequent police conduct, and being offered not for the truth of the matter asserted.
In addition, trial counsel stated that the defense in this case was that it was an accident, and it was undisputed that Cannady testified she had a pan of hot grease in her hand and "that pan of hot grease got thrown onto the [V]ictim out of her hand, or knocked out or however she qualified it[.]" Trial counsel believed that many of the statements made by the officers had already been made by other witnesses who had testified. It was trial counsel's recollection that he attempted to locate Hill to testify at trial, but was unable to locate him.
On January 27, 2016, the motion court denied the motion and ordered proposed findings to be submitted. On April 25, 2017, the motion court issued "Findings of Fact, Conclusions of Law, and Judgment and Order Denying [Cannady's] Amended Motion to Vacate, Set Aside or Correct Judgment and Sentence." The motion court found that defense counsel's decision to abstain from objecting to certain further questions and pieces of testimony was part of his "reasonable and competent" trial strategy, and that Cannady was not prejudiced. This appeal followed.
In two points on appeal, Cannady asserts that the motion court clearly erred in denying her Rule 29.15 motion, in that "competent counsel would have consistently objected to the prejudicial hearsay statements rather than offering intermittent objections[,]" (Point I) and because Cannady was prejudiced thereby (Point II). Cannady concedes that she must prevail on both points to succeed on appeal.
Standard of Review
We will affirm a motion court's denial of post-conviction relief unless its "findings and conclusions are clearly erroneous." Johnson v. State , 406 S.W.3d 892 898 (Mo. banc 2013) (citing Rule 29.15(k) ). A motion court's findings are presumed correct, and its judgment is clearly erroneous only if, after reviewing the entire record, "this Court is left with a definite and firm impression that a mistake has been made." Id. "We will defer to the motion court's determinations of credibility, and the motion court is free to believe all, part, or none of the witnesses' testimony." Martin v. State , 538 S.W.3d 340, 341 (Mo.App. S.D. 2017) (internal citations omitted). "[W]e will affirm the motion court's judgment so long as the motion court arrived at the correct result, regardless of how it got there." Id.
A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction ... has two components. First, the defendant must show that counsel's performance was deficient. This requires showing *69 that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment.
Strickland v. Washington , 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). Specifically, "the defendant must show that counsel's representation fell below an objective standard of reasonableness." Id. at 688, 2064. "Judicial scrutiny of counsel's performance must be highly deferential[.] ... A court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Id. at 689, 2065.
Second, the defendant must show prejudice from his counsel's deficient conduct. Id. at 687, 2064. To satisfy this burden, a claimant must show a reasonable probability that but for trial counsel's deficient performance, demonstrated in the first component, the outcome at trial would have been different. Id. at 694, 2068.
Analysis
A movant's "[f]ailure to make the required showing of either deficient performance or sufficient prejudice defeats the ineffectiveness claim." Strickland , 466 U.S. at 700, 104 S.Ct. at 2071. To that end, a reviewing court
need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. The object of an ineffectiveness claim is not to grade counsel's performance. If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.
Id. at 697, 2069 (emphasis added).
In its findings, the motion court stated as follows:
[Cannady] alleges in [her] motion that further objections by Trial Counsel to testimony regarding Hill's statements would have been sustained by the court. The trial record refutes this claim, as does Trial Counsel during his testimony at the evidentiary hearing on [Cannady]'s motion.
....
[Cannady] contends ... that hearsay testimony containing Hill's statements were material, and prejudicial.... Clearly this is not true regarding any statement offered to explain the officer's subsequent conduct. To the extent that testimony containing Hill's statements did not fall into this category, there was no prejudice to [Cannady], as the first witness in the trial was Victim, who had already testified to the substance of any of Hill's statements later admitted through testimony. There is no prejudice to [Cannady] by the material nature of the details of the offence being admitted through the testimony of Victim. It is doubtful that any prejudice to [Cannady] accrued from the testimony of Officers McIntyre, Laughlin and Raby concerning Hill's statements. To the extent that any prejudice did accrue, it is insufficient to undermine confidence in the outcome, and would not have changed it. [Cannady]'s claim is without merit, and is denied.
Cannady alleges that these findings were clearly erroneous. We recite Cannady's prejudice analysis, in toto :
The failure of counsel to continuously object to hearsay statements in this case was prejudicial and deprived [Cannady] of her right to a fair trial. By testifying about what, specifically, [Hill] said, the three police officers' testimony supplied details and continuity, as well as bolstering the State's case. The Eastern District has concluded that prejudice inures *70 to the accused when an absent witness's testimony connects the accused to the crime. [ State v. ] Shigemura , 680 S.W.2d [256, 257 (Mo.App. E.D. 1984) ]. 'In Shigemura , the Court noted that the officer could have characterized his reason for being at the scene of Shigemura's arrest more generally without the 'testimony of an absent and unknown witness.' Id. The same is true in [Cannady]'s case; the cumulative testimony that [Hill] advised police officers that [Cannady] assaulted [Victim] by throwing grease on her is extremely prejudicial in a first degree assault case and but for counsel's failure to keep this evidence out there is a reasonable probability the outcome of her case would have been different.
Cannady's reliance on Shigemura is unavailing. We note State v. Cole , 483 S.W.3d 470, 475-76 (Mo.App. E.D. 2016), wherein the court indicated Shigemura 'snarrow applicability:
This is not a case where the evidence of guilt was weak, or where the State relied on hearsay testimony to prove a critical component of its case. See Shigemura , 680 S.W.2d 256 at 257 (Mo.App. E.D. 1984) (evidence of guilt, without introduction of informant's hearsay statements, was weak)[.] ... The State provided ample evidence, aside from the hearsay testimony, for each of the elements it was required to prove. The hearsay testimony was merely cumulative. The evidence of Appellant's guilt was overwhelming.
We see no reason to depart from Cole 's treatment of Shigemura . The record before us demonstrates that the evidence of Cannady's guilt was overwhelming, and the challenged statements were cumulative of other properly admitted evidence.
Because Cannady fails in her burden to demonstrate that the motion court's denial of her Rule 29.15 motion was clear error, Point II is denied. We do not reach Point I since Cannady fails in the prejudice prong as required by Strickland . The judgment of the motion court is affirmed.
JEFFREY W. BATES, J.-Concurs
DANIEL E. SCOTT, J.-Concurs

All rule references are to Missouri Court Rules (2018).

Miranda v. Arizona , 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).